IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

_____

RINKY DINK, INC., d/b/a PET    )
STOP, a Washington corp.,      )
on behalf of itself and all    )
others similarly situated,     )  No. 10-2-21906-4 SEA
         Plaintiffs,           )
    vs.                        )
CAPITAL ADVANCE SOLUTIONS,     )
LLC,                           )
         Defendant.            )

_____

DEPOSITION UPON ORAL EXAMINATION OF

CHARLES BETTA

(Telephonic)

_____

Taken at 187 Parfitt Way

Bainbridge Island, Washington

DATE TAKEN:  NOVEMBER 17, 2010

REPORTED BY:  MARY A. WHITNEY, CCR - WCRL #2728

Exhibit 6

Charles Betta                                November 17, 2010

```
                                                    Page 2

  1

  2                        APPEARANCES

  3

  4

  5    FOR THE PLAINTIFFS:      ROBLIN J. WILLIAMSON, ESQ.

  6                             Williams & Williamson

  7                             187 Parfitt Way

  8                             Suite 250

  9                             Bainbridge Island, WA  98110

 10                             (206) 780-4447

 11                             roblin@williamslaw.com

 12

 13    FOR THE DEFENDANT:       MAX N. PEABODY, ESQ.

 14    (Telephonic)            Gibson Peabody

 15                             1601 Fifth Avenue

 16                             Suite 2410

 17                             Seattle, WA  98101

 18                             (206) 521-6560

 19                             mpeabody@gibsonpeabody.com

 20

 21

 22                             -o0o-

 23

 24

 25
```

Charles Betta                                          November 17, 2010

Page 3

1

2                   DEPOSITION OF CHARLES BETTA

3

4

5                         EXAMINATION INDEX

6      EXAMINATION BY                                    PAGE

7      Mr. Williamson    . . . . . . . . . . . .    4

8

9

10                  NO EXHIBITS MARKED/IDENTIFIED

11

12

13                             -o0o-

14

15

16

17

18

19

20

21

22

23

24

25

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

                                                          Page 4

1               BAINBRIDGE ISLAND, WASHINGTON

2               WEDNESDAY, NOVEMBER 17, 2010

3                       1:00 P.M.

4                        -o0o-

5    CHARLES BETTA,              witness herein, having been

6                                first duly sworn on oath,

7                                was examined and testified

8                                as follows:

9

10                        EXAMINATION

11   BY MR. WILLIAMSON:

12       Q.   Mr. Betta, would you please state your full

13   name and business address.

14       A.   Charles Betta.  Business address is

15   2068 State Highway 35, in Holmdel, New Jersey,

16   07733.

17       Q.   And Mr. Betta, you are the president of

18   Capital Advance Solutions; is that correct?

19       A.   I am.

20       Q.   How long have you been the president?

21       A.   November 2007 is when the LLC was formed.

22       Q.   And what is the business of Capital Advance

23   Solutions?

24       A.   Credit card processing and accounts

25   receivable financing.

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

Page 5

1      Q.    And the company has been in business since
2    November of 2007?
3      A.    Correct.
4      Q.    Does it do business in all of the 50 states
5    of the nation?
6      A.    Yes.
7      Q.    And Mr. Horn is the CEO of the company;
8    is that right?
9      A.    Yes.
10     Q.    Between you and Mr. Horn, if you know,
11   which one had more contact with VoiceBlaze?
12     A.    That would be me.
13     Q.    When did you first have any contact with
14   VoiceBlaze?
15     A.    I don't have the exact dates, but I did
16   business with them for some time.  I don't have the
17   exact dates on that.
18     Q.    Okay.
19     A.    I can't tell you when we started exactly,
20   the date when -- the date of when we first brought
21   VoiceBlaze on.
22     Q.    Do you think it was sometime in 2008 rather
23   than 2009?
24     A.    2008 sounds about right.
25     Q.    All right.  How did you first learn about

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                          November 17, 2010

Page 6

1   them?
2        A.   Google.
3        Q.   And when you were Googling, what were you
4   Googling for?
5        A.   Predictive dialing, voice broadcasting.
6        Q.   Prior to that search, had your company done
7   advertising to try to conduct its business by way of
8   other forms of telemarketing?
9        A.   Absolutely.
10        Q.   What kinds of things had you done before you
11   were getting in touch with VoiceBlaze?
12        A.   Mail orders, SEO optimization, cold-calling.
13        Q.   Okay.
14        A.   Basically, public records of existing
15   accounts receivable financing that was out there
16   already, things like that, but basically mailers,
17   call centers that have inbound lead traffic that come
18   to us, our business.
19        Q.   And what led you to look into the process or
20   look into using a company like VoiceBlaze?  Not them
21   in particular, but the kind of service they offer.
22        A.   I'm sorry?
23        Q.   I don't mean VoiceBlaze in particular,
24   but looking into the kind of service that a company
25   like VoiceBlaze would offer.

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

Page 7

1      A.   Just knowing others, other people that I

2  know in different industries, who were actually using

3  it.  Okay?

4      Q.   Okay.

5      A.   And more importantly, just actually doing

6  some research on it myself.

7      Q.   All right.  And when you did the Googling to

8  find companies, I assume you found others than

9  VoiceBlaze?

10     A.   I did.  I vetted a lot of it out and actually

11 spoke to multiple companies that do this and --

12 actually, the reason why I went to VoiceBlaze was the

13 cheapest cost.

14     Q.   And did there come a time when you reached an

15 agreement, either verbally or otherwise, with

16 VoiceBlaze that they would do work for you?

17     A.   Yes.

18     Q.   Had you talked with someone at VoiceBlaze

19 leading up to that agreement?

20     A.   I had.

21     Q.   Who was it?

22     A.   Nathan LeSuer.

23     Q.   How do you spell LeSuer, if you know?

24     A.   I don't.

25     Q.   Okay.

SEATTLE DEPOSITION REPORTERS, LLC

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                              November 17, 2010

Page 8

1    A.   Le-S-u-e-r, and that's off the top of
2  my head.
3    Q.   Did you speak with anyone else at VoiceBlaze
4  besides Mr. LeSuer?
5    A.   Basically, it was -- he was my point of
6  contact, but more importantly, if I had to have called
7  in, it was more for, you know, technical and customer
8  support --
9    Q.   Right.
10   A.   -- and I wouldn't know the names of any of
11  those individuals.
12   Q.   Did you at any time enter into a written
13  agreement with VoiceBlaze regarding the services
14  they were going to perform?
15   A.   No written agreement.  Everything was
16  basically when -- when we paid, enter into the system,
17  so to speak, you have to accept the terms and
18  conditions, and by pressing the button, I guess it's
19  more like an e-signature.
20   Q.   And what were the services that VoiceBlaze
21  was going to offer?
22   A.   Voice, press 1 voice dialing, basically.
23   Q.   And what do you mean by "press 1 voice
24  dialing"?
25   A.   It's predictive voice calling that has an

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                        November 17, 2010

Page 9

1    opt-in feature and an opt-out feature.

2        Q.   What would be the "opt-in"?  What do you mean

3    by that?

4        A.   Opting in, to come into our office as an

5    interested party.

6        Q.   Okay.

7        A.   Opting out, to be put on a do-not-call list.

8        Q.   I'm used to using the term of

9    "predictive dialer" as a device that makes telephone

10   calls such that within two seconds of the recipient

11   picking up, the recipient will be connected to a live

12   operator, and if that fails, then a recording is made

13   that indicates that the operator was not available.

14            Is that what you meant earlier by

15   VoiceBlaze offered "predictive dialing services"?

16       A.   Can you repeat the question again, please.

17       Q.   Did the calls that were made on your

18   behalf by VoiceBlaze involve playing a recording that

19   the recipient would hear?

20       A.   Yes.

21       Q.   All right.  And was there an understanding

22   that if the number dialed, phone number dialed, went

23   into voice mail, a recording would or would not be

24   left?  If you know.

25       A.   Well, I can explain that to you very --

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

1    in-depth --

2         Q.    Please.

3         A.    -- if you'd like me to.

4         Q.    Please.

5         A.    The system is smart enough to know what's

6    a voice mail and what's not, so it's kind of

7    open-ended on what you say into it, so it's very --

8    yes, you can program it to do that or no, you don't

9    have to.

10        Q.    Okay.  In your case --

11        A.    Yes.

12        Q.    -- what was the decision, to leave

13   messages --

14        A.    No message left on an answering machine.

15        Q.    Okay.

16             MR. PEABODY:  This is Max.  Let me just

17   interject one thing.  Probably for the court reporter,

18   we need to make sure that Rob gets his question out

19   fully, and then you maybe pause for a second and then

20   give an answer.

21             THE WITNESS:  Okay.

22        Q.    I presume there was a script that was used

23   to make the recording, leave the recording, make the

24   announcement as it were; is that right?

25        A.    Correct.

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                November 17, 2010

```
                                                    Page 11
 1        Q.   And who would devise that script?
 2        A.   Is the question who would record the script
 3   or who would actually write the script?
 4        Q.   Who wrote it.
 5        A.   Who wrote the script?
 6        Q.   Yes.
 7        A.   We did.
 8        Q.   And did the script change over time?
 9        A.   Did it change over time in what way?
10   I don't --.
11        Q.   Did you change the language?
12        A.   The language?
13        Q.   Yes.
14        A.   There are multiple scripts.
15        Q.   Would you use one script for a while and
16   then switch to another, or were there campaigns
17   where you would be using two or more at the same
18   time?
19        A.   We would never run two or more at the same
20   time, I would say.  Since we do have two different
21   businesses that kind of run here -- one is credit card
22   processing and one is the accounts receivable
23   financing -- that's when we would run two different
24   scripts.
25        Q.   Who would do the actual recording of the
```

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

Page 12

1    scripts?

2         A.   Actually, somebody that was referred from

3    VoiceBlaze, and to be totally honest with you, I don't

4    know the name.

5         Q.   Okay.

6         A.   But it was a professional voice talent, so to

7    speak.

8         Q.   The goal, I presume, was to have,

9    through VoiceBlaze, telephone calls using this script

10   made to potential clients, correct?

11        A.   Correct.

12        Q.   And how were the telephone numbers that were

13   dialed produced?

14        A.   The data was uploaded by VoiceBlaze.

15        Q.   And was VoiceBlaze given directions by you

16   or someone at the company as to what kind of numbers

17   you wanted?

18        A.   As far as a specific SIC code?  Yes.

19        Q.   Okay.  What was the phrase you used,

20   "SIC code"?

21        A.   Correct.

22        Q.   What does that mean?

23        A.   It's a number that categorizes a specific

24   business or industry.

25        Q.   All right.  Would you give directions to

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                           November 17, 2010

Page 13

1   VoiceBlaze, saying:  Please come up with some phone
2   numbers that have these SIC codes?
3        A.   Yes.
4        Q.   Is that how it would work?
5        A.   Yes.
6        Q.   Would that be done verbally, by calling
7   somebody and telling them you wanted it done,
8   or how would it work?
9        A.   It could have been all of the above.
10  It could have been an email, it could have been a
11  call.
12       Q.   And did you have these calls made by
13  VoiceBlaze in the context of sort of a campaign,
14  where you would do a particular campaign to a
15  particular group and then you would do a different
16  campaign?  Did it work that way?
17       A.   I don't know.  There is an interface.
18       Q.   Right.
19       A.   I think we really need to actually go with
20  the business to understand the actual interface before
21  we can just say:  VoiceBlaze, VoiceBlaze, did I make
22  VoiceBlaze.
23            Yes, VoiceBlaze put the data up,
24  but, more importantly, the system in the interface
25  has all the bells and whistles for me to program,

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

                                                          Page 14

1    myself.

2         Q.   I've got it.

3              So you would have VoiceBlaze provide you

4    with data, and you indicated that it would then be

5    uploaded.  Who would do the uploading?

6         A.   VoiceBlaze would.

7         Q.   And would it be uploaded to your account on

8    their site?

9         A.   On the interface, correct.

10        Q.   And you could go to that, I guess, interface

11   and then determine or direct when the calls were to be

12   made?

13        A.   Uh-huh -- yes, and who would I like to

14   be called and who would not like to be called, for

15   that matter.

16        Q.   Who would not like to be called.

17        A.   Who would not like to be called, correct.

18        Q.   All right.  So you could go on -- I'll call

19   it the "interface," I guess it was, a site -- a site

20   on their website where you could, in effect, deal

21   with your account and have calls made?  Am

22   I describing that right at all?

23        A.   I can't say yes or no to that because I don't

24   know if it was their website.  I have a portal -- a

25   URL address that would take me to a user name and

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

Page 15

1   password, and for me to answer that, it was going to

2   their website.

3        Q.   All right.

4        A.   I don't know -- I don't know where it was

5   going.

6        Q.   But you would enter in a user name and a

7   password --

8        A.   And a password that was given to me by

9   VoiceBlaze, correct.

10       Q.   Would you then get to some screen where you

11  could make entries in some way to direct the calls to

12  get sent out?

13       A.   Yes.

14       Q.   So what were the different choices you had?

15  I mean, did you have a choice of like when the calls

16  would be made, what time of day?  What was going on

17  when you would actually initiate the calls?

18       A.   What time of day -- okay? -- where I was

19  calling.  How many -- how fast I wanted the actual

20  system to run, how slow I actually wanted it to run.

21       Q.   Okay.

22       A.   And then a bunch of other things.  Basically

23  what, you know, states I wanted to block and what

24  states I didn't want to block.

25       Q.   Okay.

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                November 17, 2010

Page 16

1        A.   What -- where I wanted to -- how I wanted to
2   scrub against do-not-call lists, you know, nationally,
3   or basically an internal do-not-call list.  If anybody
4   happens to opt out of one of our campaigns, obviously
5   we don't want to call them again.
6        Q.   Right.
7        A.   So we would scrub against that, as well.
8        Q.   And when you first did this, do you recall
9   how many phone numbers had been provided and
10  uploaded to the interface by VoiceBlaze?
11       A.   I don't.
12       Q.   Do you even recall if it was 50,000 versus
13  500?  I mean, any ballpark?
14       A.   It would -- it was probably in the hundreds
15  of thousands.
16       Q.   And I assume --
17       A.   Don't hold me to that, because I don't have a
18  specific -- can't pinpoint that.
19       Q.   The data, though, was on this place where you
20  would go, as it were, after you put in your user name
21  and password?  Is that where you could then literally
22  sort of look at the data if you wanted to?
23       A.   You cannot look at the data.  It only shows
24  up in canisters.  It's a tranche of 20,000, 30,000, so
25  to speak, and it's segregated by time zone.

Charles Betta                              November 17, 2010

Page 17

1       Q.   Okay.

2       A.   But can you see individual records?  No.

3       Q.   So you would use the software, I suppose,

4   to make calls, and if you said you wanted them only to

5   go to, say, New Mexico and Arizona, did the system

6   have the capacity to search the data, then, for those

7   numbers?

8       A.   Well, I pretty much just told them that it

9   segregated it per time zone, but if I wanted it to do

10  that, I could.

11      Q.   Okay.

12      A.   If you are saying within an Eastern time

13  zone, if I just wanted to just target New York, can

14  I block every other state in the country.

15      Q.   Or the time zone, right?

16      A.   Or the time zone, If I'm targeting New York,

17  and I'll get into specifics about that in a second.

18  So if I wanted to target just New York, yes, I can

19  block every other state in the country so as just to

20  target New York.

21      Q.   Okay.  And --

22      A.   And I'll explain if you want me to go

23  in-depth about it --

24      Q.   Yes.

25      A.   -- if I can.

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

1       Q.   Sure.

2       A.   Okay.

3       Q.   If you could, just explain how each time

4    you went in, you would direct that particular effort,

5    as it were.

6       A.   Okay.  So basically we're -- Geoff and I are

7    --  aware of ADAD calls -- okay? -- and we have a call

8    list, basically, which tells us what states we are

9    allowed to dial into and what states that we're not

10   allowed to dial into, and we abide by it.

11            When I say we "abide by it," basically

12   that there's no hindering of a campaign or a schedule

13   if somebody else, you know, got my password or user

14   name and password -- okay? -- so these states -- which

15   are, you know, civil or criminal -- okay? -- and even

16   if it was gray in the least bit -- are blocked from

17   calling.

18            The way the system blocks it is, is

19   it blocks every area code in that state, and it's

20   smart enough to update itself if there's new area

21   codes that do come in.  Okay?

22            More importantly, we're scrubbing against

23   do-not-call lists and scrubbing against our internal

24   do-not-call list, so it's pretty hard to get a rogue

25   call to go into one of these states that we're

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

1    blocking.

2        Q.   I want to come back to that.  What I was

3    wanting to try to determine is, if you had decided you

4    wanted some calls to get made, my understanding is

5    you would log in with your user name and password,

6    and then you would make some decisions about

7    how many calls to be made, where, et cetera; is that

8    right?

9        A.   Correct.

10       Q.   And each time you did that, were you to

11   prepay something or other before you could actually

12   send out the --

13       A.   Yes.

14       Q.   And how would you know how much to pay so you

15   could then use the system?

16       A.   It was on a per-minute basis, which was

17   billed in six-second increments.

18       Q.   Right.

19       A.   There was cost to it, and that would be

20   correlated, directly correlated, to the amount of

21   money that I would send.

22       Q.   So, before you would sign on, then, to have

23   the calls made, you would have made a payment; is that

24   correct?

25       A.   Yes.

Charles Betta                          November 17, 2010

Page 20

1      Q.   And would you know from the amount of that
2   payment how many calls you could then initiate?
3      A.   Again, that's an open-ended question.
4   I don't know how long somebody could stay on the phone
5   or how long somebody could -- how many people would
6   hang up, so, no.
7      Q.   Okay.
8      A.   I'd have to say no to that.
9      Q.   Was there ever a time when you would make a
10  prepayment and initiate some calls, and then at some
11  point the calling would stop because you had used up
12  your minutes, used up your time, as it were?
13     A.   Are you asking me did that happen or could
14  that happen?
15     Q.   Did that happen.
16     A.   It could happen, correct.
17     Q.   No, did it happen.
18     A.   Oh, I'm sorry.
19     Q.   That's all right.
20     A.   I misunderstood what you said.  Did it happen
21  with me?
22     Q.   Yes.
23     A.   Not that I recall.  I mean, it could have.
24  We could have, you know, run out of minutes, so to
25  speak, and then replenished.

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

Page 21

1        Q.   All right.  What about if you --

2        A.   But I don't recall, you know, a for-instance.

3        Q.   If you did not run out of minutes, would you,

4    in effect, have a credit?

5        A.   A credit?

6        Q.   For the next time you called in.

7        A.   Yes, yes.

8        Q.   And when you were charged 3.5 cents

9    per minute, would that be from the beginning of the

10   call being made or to when it was first picked up?

11   How did the timing work?

12            MR. PEABODY:  Object to the form of the

13   question.

14       Q.   You get to answer.  I'm not quite sure why

15   the objection was made.

16            MR. PEABODY:  I'm not sure where the 3.5

17   -- I don't recall that being mentioned, so the

18   objection is assumes facts not in evidence, unless I

19   missed something.

20            MR. WILLIAMSON:  It's in the interrogatory

21   answers, and I thought he said it.

22       Q.   How much were you charged by VoiceBlaze?

23       A.   How much -- the actual amount -- hold on a

24   second.  On the minute side you're saying, correct?

25       Q.   Right.

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

                                                          Page 22

1        A.    Okay.  It's .014 cents per minute.

2        Q.    .014 cents per minute.

3        A.    Correct.

4        Q.    And the dialer or whatever it is that was

5    being used, would it dial one call at a time and just

6    keep doing it until they were all done?

7        A.    Yes.

8        Q.    So would you be charged from when the

9    dialer first started to call the number in question

10   through when it would --

11       A.    Six-second increments.

12       Q.    Right.

13       A.    Six-second increments.

14       Q.    But did those six seconds or longer start

15   with the call being placed?

16       A.    I wouldn't have the answer to that, no.

17       Q.    All right.  And the call had a feature where

18   someone could press 1 to talk with someone; is that

19   right?

20       A.    No.  That's also optional.

21       Q.    Oh, okay.  In your case, what did the script

22   say, if anything, about calling to get more

23   information or what have you?  Did it indicate to

24   press 1 or did it just give a number to call?

25       A.    You're asking about the script, the script

Charles Betta                                  November 17, 2010

                                                        Page 23

1    itself, correct?

2         Q.   Yes.

3         A.   Okay.  There were some scripts that had 1 and

4    2, there were some that could have, you know, 7 and 2,

5    and some scripts that could have 2 and 3.

6         Q.   Did all of your scripts have prompts that

7    people could press to get further information or ask

8    to opt out?

9         A.   Yes.

10        Q.   If somebody pressed a prompt so they could

11   get more information, would they then be connected

12   with a live operator?

13        A.   They would.

14        Q.   And during the time they're talking with

15   a live operator, would that count towards the charges

16   made by VoiceBlaze?

17        A.   I believe so.

18        Q.   If a call were placed, the phone rang for

19   20 seconds, whatever, and there was no pickup, so a

20   disconnect, were you charged for that?

21        A.   I'm not so sure on that.

22        Q.   Between you and Mr. Horn, did one of you go

23   onto the interface and initiate calls more often than

24   the other?

25        A.   That would be me.

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

Page 24

1      Q.   Okay.  And did you eventually stop using

2   VoiceBlaze?

3      A.   Yes.

4      Q.   When was that?

5      A.   I don't have the dates specifically in front

6   of me, so as I'm sitting here, I don't know.

7      Q.   Why did you stop?

8      A.   Cost.

9      Q.   If you prepaid something, went onto the

10  interface, and then had a number of calls made,

11  would you ever get a report or know how many, in fact,

12  got made?

13     A.   How many calls were made?

14     Q.   Yes.

15     A.   Yes.

16     Q.   Would that report indicate how many calls

17  produced someone who answered versus how many were not

18  answered or went to voice mail?  What would be in the

19  reports?

20     A.   Statistics on how many calls were made,

21  how many calls where answering machines were -- I want

22  to say "hit," because it's specific to if you were

23  leaving a message, but how many answering machines the

24  system picked up on, how many problems there were in

25  the system, how many live persons.

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

Page 25

1       Q.    Would the reports tell you how many people
2   who picked up and then prompted, hit one of the
3   prompts, as opposed to hung up?  Would it have all of
4   that kind of information?
5       A.    Well, you could see who opted in and opted
6   out, how many people opted in and opted out of the
7   campaign.
8       Q.    And were these reports available at the
9   interface?  Were they sent to you?  What form would
10  they come?
11      A.    At the interface.
12      Q.    And were those reports available to you
13  throughout the time that you were using VoiceBlaze so
14  that if you wanted to go back and look at one from an
15  earlier time, they were available?
16      A.    You're asking me if I could go back to an
17  earlier date to get that information, from earlier
18  campaigns?
19      Q.    Yes.
20      A.    Yes.
21      Q.    And when you terminated your account
22  with VoiceBlaze, was there something formal that you
23  did so that you now could not use your user name and
24  password and go on line and -- or go into the
25  interface again?

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                   November 17, 2010

Page 26

1       A.   Yes.

2       Q.   What did you do to terminate --

3       A.   Stop sending them money.

4       Q.   So if you --

5       A.   I don't mean to be funny about that, but,

6   yes, that's all it took.

7       Q.   So if you sent in money today, would you be

8   able to get into the interface again?

9       A.   I don't know.

10      Q.   Okay.

11      A.   Good question.

12      Q.   And if you were to be able to get into the

13  interface, then you could get all the reports; is that

14  correct?

15      A.   I don't have the answer to that question.

16      Q.   Is there any reason for you to think you

17  couldn't?

18      A.   Is there any reason that I think that

19  VoiceBlaze couldn't --

20      Q.   No.

21      A.   -- or is there any reason why I think

22  I couldn't?

23      Q.   Any reason why you could not do it if you

24  just sent in some money now.

25      A.   Yeah, because it would be specific to a start

Charles Betta                                    November 17, 2010

Page 27

1    and finish date for that specific campaign.

2         Q.   Okay.

3         A.   Specific, I guess, "account" that was

4    created.  I don't want to say "campaign."  Maybe

5    I said that wrong.

6         Q.   That's all right.

7              I'm trying to understand.  As far as

8    VoiceBlaze knows, they don't know either way if you've

9    stopped using them, as it were, other than you haven't

10   sent any money in.  Is that correct?

11        A.   That's correct.

12        Q.   So you didn't call anybody --

13        A.   Well, I have sent some emails and I've gotten

14   no response.

15        Q.   And you've gotten no response?

16        A.   No.

17        Q.   What were the emails about?

18        A.   Just wanting to get back into the system

19   to -- you know, just to vet this out a little bit more

20   and to basically give my attorney access to it.

21        Q.   And those emails have gone -- there has been

22   no response?

23        A.   No.

24        Q.   While you were still using VoiceBlaze,

25   did you ever have occasion to send emails to anybody?

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

1      A.   Sure.

2      Q.   And they would respond, I gather.

3      A.   They would.

4      Q.   And so do you have any idea why now they

5  don't respond to your emails?

6      A.   I don't.

7      Q.   Have you called Nathan to ask him about what

8  is going on?

9      A.   I've called once or twice and no response.

10      Q.   Did he know that a lawsuit had been filed?

11      A.   I don't know that.

12      Q.   Did you leave him a voice mail?

13      A.   Basically to call me back.  That was the long

14  and the short of it.

15      Q.   But not, We've been sued, call me back,

16  I want to talk to you about it?

17      A.   Absolutely not.

18      Q.   I'm just trying to understand why somebody

19  who apparently would call you back stopped and

20  whether there was any explanation for it, or a

21  company that used to respond to your emails would

22  suddenly stop, and I assume you have no explanation

23  for that.

24      A.   I don't.

25      Q.   Have you tried to put in $100 and see if you

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

Page 29

1    could then use your user name and password and get

2    into the interface?

3        A.    No, because every time that I would actually

4    add money, it would be through a Google "invertation,"

5    so to speak -- that was sort of like a PayPal?

6        Q.    Right.

7        A.    -- and it was kind of linked to my bank

8    account, and that's the only way I would add funds.

9        Q.    Right.

10       A.    I wouldn't know just to send a check to, you

11   know, VoiceBlaze and just cross my fingers and hope

12   that they would add funds into it.  It was something

13   that -- you know, would send me a link, I would go

14   onto it, put my information in, and I would say how

15   much money I wanted to, you know, PayPal or Google --

16   whatever system it was -- to them, and that's the way

17   I would add funds.

18       Q.    What would initiate them sending you a link?

19       A.    An email.

20       Q.    From you, right?

21       A.    I would initiate -- correct.

22       Q.    In other words, would you --

23       A.    I would initiate it, I would respond to it or

24   go to the link, and from there I would add funds.

25       Q.    But would the process begin by you sending an

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                          November 17, 2010

Page 30

1    email that says:  I want to put some money in because
2    I want to do another set of calls?
3         A.   Yes.
4         Q.   Okay.
5         A.   Send me a link for X amount of dollars.
6         Q.   And have you tried to do that since this
7    lawsuit was filed?
8         A.   Well, I'm not going to say I've tried to do
9    that, so to speak, but I've tried to correspond with
10   VoiceBlaze via email and I've gotten no response.
11        Q.   Okay.
12        A.   Have I dangled putting, you know, money in
13   front of it?  No.
14        Q.   Were the reports they would give you that
15   were on the interface about results of a particular
16   call effort printable?
17        A.   Can you repeat that question again.
18        Q.   Could you print the reports you talked about
19   earlier?  Could you have printed them out?
20        A.   Could I have?
21        Q.   Yes.
22        A.   Yes.  I think, yes, I could have printed them
23   out.
24        Q.   Did you ever?
25        A.   No.

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                November 17, 2010

Page 31

1      Q.   Did the reports ever say to whom the calls
2   went, the specific numbers?
3      A.    The reports would actually -- there's
4   two different types of reports that are in there.
5   The one that that we were speaking about before would
6   not have phone numbers in there.  You couldn't see who
7   was dialing out on them.
8      Q.   Right.
9      A.   And then there was other reports that
10  basically would come in that -- where you could see
11  numbers that were actually coming in on a caller ID,
12  if the number was not blocked on the other end.
13     Q.   So you could see numbers of persons that
14  were calling to you?
15     A.   Only inbound.
16     Q.   Right.
17     A.   Not outbound.
18     Q.   Okay.  Do you know where VoiceBlaze
19  physically was located, where it had its offices or
20  headquarters?
21     A.   I think it was Pennsylvania, but then
22  again I could be wrong.  I don't know.  I don't know
23  to be -- I never physically mailed anything to
24  VoiceBlaze.
25     Q.   And you talked about blocking calls to

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                           November 17, 2010

```
                                                    Page 32
 1    certain states because of concerns about civil or
 2    criminal laws that forbid them.  Do you recall that?
 3         A.   I do.
 4         Q.   I don't know if I -- you said something
 5    about, We knew about "AD" calls.  Is that --
 6         A.   "ADAD" calls.
 7         Q.   Oh, okay.  ADADs.  I'm sorry.
 8         A.   Correct.
 9         Q.   All right.  Which is what you were doing?
10         A.   I'm sorry?
11         Q.   You were using VoiceBlaze to make ADAD calls,
12    correct?
13         A.   Yes.
14         Q.   And you became aware of certain states
15    where the calls should not be made; is that correct?
16         A.   Correct.
17         Q.   How did you become aware of it?
18         A.   We're a credit card processing company,
19    and these lists are provided -- actually, this list is
20    provided to us, and basically we need to abide by it,
21    you know, the provisions with VISA and MasterCard.
22         Q.   Okay.  So who --
23         A.   Basically, it's on our backbone's website,
24    and we point to it, and we've taken it, actually
25    embedded it into our dialing systems, and it's
```

Charles Betta                                    November 17, 2010

Page 33

1   permanent.

2        Q.    Okay.

3        A.    And it was at the time of VoiceBlaze,

4   as well.

5        Q.    You're saying that there was a list provided

6   by somebody or other that had the list of these states

7   in it?

8        A.    Yes.

9        Q.    Who provided the list?

10       A.    I'm sorry?

11       Q.    Who provided the list.

12       A.    Our backbone provider for credit card

13  processing, which is North American Bancard.

14       Q.    North American Bancard.

15       A.    Correct.

16       Q.    What does "backbone" mean in this context?

17       A.    They are the ISO, independent sales

18  organization, that houses and -- it's actually where

19  the credit card transactions are run through for

20  authorizations.  So it's not VISA and MasterCard,

21  it's basically an ISO.

22       Q.    All right.

23       A.    North American Bancard is that ISO, and we're

24  a layer down from them.

25       Q.    And when you say they provided a list, was it

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                           November 17, 2010

Page 34

1   literally sending you something in the mail, was it

2   something you could print off --

3        A.   Something you could print off --

4        Q.   -- or was it on their website --

5        A.   Something you could print off their website.

6        Q.   And could one go onto that website today and

7   see what the list is?

8        A.   You would have to be an agent.

9        Q.   Pardon me?

10       A.   We would have to be an agent of.

11       Q.   Okay.  And --

12       A.   It doesn't make any sense for anybody to go

13  to a website -- I'm just explaining -- who is not an

14  agent, so --.

15       Q.   So at some point, maybe even before you were

16  using VoiceBlaze, you were aware that there was this

17  list on the site?

18       A.   Absolutely.

19       Q.   And do you have a copy of that list in your

20  offices?

21       A.   We do.

22       Q.   Do you have a copy of it as it existed at the

23  time you began to use VoiceBlaze?

24       A.   It didn't -- it never changed.

25            MR. WILLIAMSON:  I want to get a copy.

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                          November 17, 2010

Page 35

1    I would like to see it, and I'm wondering how --

2                MR. PEABODY:  Charles, can you provide

3    that.

4        A.   I can get you a copy.

5        Q.   All right.

6             And do you recall that that list indicated

7    that ADADs were not to be made to Washington?

8        A.   Absolutely.  When you see the list,

9    you'll know.  It has restrictions, it has civil or

10   criminal violations, within what states they are and

11   aren't.

12       Q.   No, I'm interested because I've seen lists

13   from other outfits in this business that were produced

14   where Washington was not on the list, and so obviously

15   people interpret the laws differently and that's fine.

16            You read this to mean calls shouldn't be

17   made to Washington, correct?

18       A.   Correct.

19       Q.   How did you then make sure that such calls

20   didn't get made, that such calls were not made?

21       A.   Say that again.  Can you repeat that question

22   for me.

23       Q.   How would you make sure, when you were

24   using VoiceBlaze, that calls would not be made to

25   Washington?

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

Page 36

1      A.   Correct.

2      Q.   How would you --

3      A.   I blocked Washington State from ever

4   being called.  No matter if it was a -- Pacific Coast

5   data that was being entered by VoiceBlaze, it couldn't

6   trump me putting that state on that -- a do-not-call

7   state into the system.  So it would automatically

8   block out every area code in the state of Washington.

9      Q.   Was this is something you did when you

10  were first setting up the interface with VoiceBlaze?

11     A.   Yeah -- yes.

12     Q.   So you did it that first time, and then just

13  assumed, as I think you certainly would have been

14  entitled to, that that would remain in effect the

15  whole time you would use VoiceBlaze?

16     A.   It's embedded.

17     Q.   I'm not sure what you --

18     A.   You can't remove it.

19     Q.   Pardon me?

20     A.   You can't remove it.  You set rules, and the

21  rule is that if Washington State is a state that don't

22  I want to be called, it will not be called.

23  It's "embedded."  It's a rule that I create in the

24  interface.

25     Q.   Are you able to produce reports or data today

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

Charles Betta                                November 17, 2010

Page 37

1   that would tell you the area codes of all persons,

2   throughout the time you made campaigns, who pressed

3   the prompt to be connected to your company to get more

4   information?

5       A.   From VoiceBlaze you say?

6       Q.   No, from yourself.  Do you have that

7   information?

8       A.   As far as inbound traffic is concerned?

9       Q.   Yes.

10      A.   I'm not too sure that I can do that myself,

11  but I don't -- I don't know if I can answer that

12  question.  I don't know if I can provide data for

13  since I opened my doors until now for everybody that

14  called in to our operation.  I'm sure that if I called

15  my phone company I could.

16      Q.   I'm trying to determine if you would have

17  any way of determining, based upon using VoiceBlaze

18  only, the phone numbers of persons who, receiving that

19  ADAD, would have pressed the prompt to permit them to

20  talk with somebody at your company.

21      A.   I don't have that information.

22      Q.   Is it available or you just don't have it?

23      A.   I don't have the information because --

24  I think we just went over this -- basically I can't

25  get in to query or look back into a system that I

Charles Betta                                    November 17, 2010

Page 38

1    don't have access to.

2        Q.   Right.  I'm just --

3        A.   But could it be?

4        Q.   No, I'm trying to determine whether, just at

5    your offices where you're located, you have any way of

6    knowing, from your own information, persons that

7    called you as a result of the VoiceBlaze broadcast and

8    their having pressed 1 to talk to somebody.

9        A.   No.

10       Q.   All right.

11       A.   I can't say what came in off of that and what

12   didn't.

13       Q.   What about persons who asked to be on the

14   internal, as it were, do-not-call list?

15       A.   (No audible response.)

16       Q.   Let's start over.  Do you have an internal

17   do-not-call list?

18       A.   We do.

19       Q.   And whether somebody is on that as a result

20   of having pressed the prompt with respect to a call

21   made through VoiceBlaze or in some other way I presume

22   is not broken down?  Is that correct?

23       A.   In my systems?

24       Q.   Yes.

25       A.   No.

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

Page 39

1      Q.   So, if I said to please produce your
2  do-not-call list, it would have numbers on it, but how
3  those numbers got on the list couldn't be determined;
4  is that right?
5      A.   Well, you could -- by opting into 2, it puts
6  you on an internal do-not-call list.  Okay?
7      Q.   Right.
8      A.   Whether -- you're saying to me can I put
9  someone else's name on a -- can I do that myself --
10     Q.   No.  Let me --
11     A.   -- if somebody said to me and -- opted into a
12 yes response?
13     Q.   Let me try a different --
14     A.   And ask -- I'm sorry, go ahead.
15     Q.   Let me ask it differently, because I'm
16 confusing you.
17          Let's assume that unbeknownst to you
18 the VoiceBlaze equipment, technology, what have you,
19 was not honoring your request about Washington --
20     A.   Okay.
21     Q.   -- and it turns out calls were getting made,
22 and at least one apparently was made, unless my client
23 is not telling the truth.  Okay.  Are you with me so
24 far?
25     A.   I am.

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                          November 17, 2010

Page 40

1      Q.   All right.  And so I say to myself, Well, let

2  me get the do-not-call list, because if I get it and I

3  see a bunch of Washington persons on it, I can say to

4  myself, Gee, some calls did get through to Washington,

5  because at least these people in Washington asked to

6  be put on the do-not-call list.

7      A.   Right.

8      Q.   So let me try again.

9           Would the do-not-call list tell me who had

10  been called through VoiceBlaze and who had pressed the

11  prompt so they would not be called again?

12      A.   I wouldn't know how to query that --

13      Q.   No --

14      A.   -- so I wouldn't have that answer to that.

15      Q.   Okay.

16      A.   I wouldn't -- if somebody opted out and is on

17  a do-not-call list?

18      Q.   Right.

19      A.   I don't have that data for me to say that

20  I can scrub it.  The system has it.  So I wouldn't

21  know how to extract it.  Okay?

22      Q.   Well, you have a do-not-call list, don't you?

23  You have an internal --

24      A.   I'm sorry?

25      Q.   You have an internal do-not-call list right

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                              November 17, 2010

Page 41

1    now, don't you?

2         A.    Yes.

3         Q.    And you could print it out and we could look

4    at it, right?

5         A.    No.  The system has the do-not-call list,

6    the internal do-not-call list.  I don't.

7         Q.    What system?

8         A.    The interface which we spoke about,

9    from VoiceBlaze.

10        Q.    All right.  So you've never had one as a

11   result of other telemarketing or what have you

12   activities in which you've engaged that created

13   persons asking to opt out?

14        A.    As far as our business is concerned?

15        Q.    Right.

16        A.    No.

17        Q.    Okay.

18        A.    No.

19        Q.    Okay.

20        A.    The internal do-not-call list is specific to

21   the interface.

22        Q.    All right.  Did you ever observe one way

23   or -- well, okay.

24             I assume and hope that some of the --

25   well, not hope.  I assume that some of the calls

Charles Betta                              November 17, 2010

Page 42

1     produced leads, did they not?

2          A.   Some of -- yes.

3          Q.   And perhaps even -- well, let's start over.

4               Do you have a list -- internally, not on

5     the interface -- of leads that arose as a result

6     of the VoiceBlaze telephone calls?

7          A.   Of my -- do I have a client list?  Do we keep

8     track of how they came in?  Like we said earlier in

9     the conversation, we have multiple lead sources that

10    come in to our establishment, multiple.  Okay?

11              We have -- whether it could be from

12    cold-calling or, basically, mailers or, you know, a

13    call center, which is cold-calling, and live

14    transferring, you know, of a person of interest into

15    our operation.  I mean, there's just vast ways that we

16    get our business.

17         Q.   Okay.

18         A.   There are outside agents that provide

19    business to us from other states, for national

20    companies.

21         Q.   If I said to you or Max, Please provide me

22    with the phone numbers of every single client that has

23    a Washington area code as their phone number, and

24    I got a list of five or 500 -- I don't care -- neither

25    you nor I could look at that and determine whether

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                         November 17, 2010

Page 43

1   they had come as a result of the VoiceBlaze calling or

2   some other way; is that correct?

3       A.   Yes.

4       Q.   And I assume that during the time you were

5   using VoiceBlaze, you were continuing with the other

6   marketing efforts you've described.

7       A.   All of them.

8       Q.   The written discovery that we served on you,

9   as a result of it we got certain documents, one of

10  which were these Google checkout forms making the

11  payments in question.  Do you recall providing those

12  to your lawyer to give to us?

13      A.   Yes.

14      Q.   So if there was a request for a $500

15  payment, and then later another payment and so on, do

16  those amounts have any correlation to the number of

17  calls that got made?

18      A.   Well, just times it by .014 and you'll get

19  your number.

20      Q.   Or --

21      A.   Did you say duration?

22      Q.   No.  I'm just trying to determine

23  how many -- if you put in $500 and most if not all of

24  that got used up, would you then know how many calls

25  got made?

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                          November 17, 2010

Page 44

1      A.   I think I answered this question earlier in

2   the deposition.

3      Q.   Well, just bear with me, because I don't

4   understand your world.  My understanding is --

5      A.   I get it.  I know -- I know that.  I'm not

6   trying to be evasive, either, I'm just -- I'm saying

7   -- it's very simple.  All right?

8              If I gave $1,000 --

9      Q.   Right?

10      A.   -- then $1,000 times .014 equals how much?

11      Q.   Well, I'm not sure we multiply it or we

12   divide it.

13      A.   I'm telling you.

14      Q.   Yes.  Okay.  For each minute you paid .014;

15   is that right?

16      A.   Right.  So if I -- if I was to purchase

17   100,000 minutes -- I'll do it a different way.

18      Q.   All right.

19      A.   If I was to purchase 100,000 at .014 --

20   correct?

21      Q.   Right.  Okay.

22      A.   -- how much would that cost me?

23      Q.   And when you say it's ".014," does that mean

24   14,000ths of a cent per minute or 1.4 cents per

25   minutes?

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                          November 17, 2010

Page 45

1    A.   No, it's 100,000ths of a cent, correct.
2  It's less than a -- I'm sorry.  You said -- it's
3  100,000 times .014, which would be correlated to a
4  penny and a half -- correct?
5    Q.   Okay.  So --
6    A.   -- or less than a penny and a half, which
7  would equal $1400.
8    Q.   Let's say it was penny and a half, just for
9  round numbers, per minute.  All right?
10    A.   Uh-huh.
11    Q.   So if you paid $500 for something, would you
12  divide that by a penny and a half to get the total
13  number of minutes that that $500 would have produced?
14    A.   Yes.
15    Q.   And how long that would --
16    A.   And how many minutes, how many -- how long
17  that would last, the question you asked, is kind of
18  open-ended.  I don't know.
19    Q.   Okay.  And how long would --
20    A.   You couldn't know.  It would be like
21  predicting the lotto.
22    Q.   How long were the scripts, 20 seconds, 30?  I
23  know they varied, but roughly how long were the --
24    A.   Some of them could have, yes.
25    Q.   So 20 to 30 seconds, generally?

Charles Betta                                    November 17, 2010

Page 46

1      A.   Well, 15, 20, 30 sometimes, right in that

2   range.

3      Q.   And this will sound just as silly as most

4   of my questions, but does Mr. Horn know anything

5   more about all of this than you do?  I don't want to

6   have to bother him if he has the same understanding.

7      A.   He doesn't.  In fact, he knows less.

8      Q.   I won't tell him you said that, but okay.

9   Because it seems to me that you obviously do know

10  about it, and I take your word for it that --.

11            I assume, by the way, that if my client

12  is telling the truth and he got a call, you assume

13  there was some breakdown in the VoiceBlaze system,

14  right?

15     A.   No.  I honestly assume that your customer

16  could have either, A, seen a mailer, which it's very

17  well possible that it hit his location, or, B --

18  I don't know.  I mean, I'm all over Google.  If you

19  put in "credit card processing Washington," you know,

20  or "credit card processing California," or "credit

21  card processing New Jersey" -- I'm not going to say

22  that.  My name is not going to populate on the first

23  page.

24     Q.   I'm just saying if my client testifies that

25  he picked up his phone and he got an ADAD from your

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                              November 17, 2010

Page 47

1    company, and he's got a Washington phone number, then

2    it's your assumption that something went wrong with

3    VoiceBlaze, correct?

4         A.   I'm not going to say that's my assumption.

5    I'm going to say that it could have happened that

6    somebody called him or transferred him to us or --

7    that wasn't an ADAD call.

8         Q.   I'm saying --

9         A.   It could have very well happened that way.

10        Q.   Right, but what if it was an ADAD?  I'm just

11   asking you to assume.  Because I'm assuming your --

12   because it sounds to me what you're saying is that you

13   knew it was set up that it wouldn't go to Washington,

14   and if something went into Washington, it wasn't your

15   fault, it was something wrong with VoiceBlaze.  I

16   mean, that's what you're saying, right?

17             MR. PEABODY:  Object to the form of the

18   question.

19        Q.   Let's start over so it's not objectionable.

20             Do you have any explanation why

21   Mr. Gardner, who is the person that owns this company

22   that is the plaintiff, would have received an ADAD

23   call from your company, other than a breakdown of the

24   VoiceBlaze system?

25             MR. PEABODY:  So you are asking him to

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

Charles Betta                                November 17, 2010

Page 48

1    assume that there was an ADAD call received at his

2    company, correct?

3              MR. WILLIAMSON:  Yes.

4              MR. PEABODY:  For the purpose of this

5    question.

6              MR. WILLIAMSON:  Yes.

7        A.   I'm -- okay.  So we're assuming that a call

8    was made to your client, correct?

9        Q.   Right, and it was an ADAD, a prerecorded

10   call, it said whatever your script said, it gave him

11   some options, and so forth.

12       A.   Okay.  And now you're asking me is

13   it possible that it was a glitch in the VoiceBlaze

14   system --

15       Q.   No.

16       A.   -- that did this?

17       Q.   Let me ask it differently.

18             How do you account for how that call got

19   through, that hypothetical call, given --

20       A.   I can't.

21       Q.   All right.  Good.  That's all I have.  I want

22   to thank you for putting up with me.  I appreciate

23   that.

24             MR. WILLIAMSON:  And Max, I guess you can

25   ask questions if you want.

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                          November 17, 2010

Page 49

1          MR. PEABODY:  No, I have no questions.

2          MR. WILLIAMSON:  Okay.

3          MR. PEABODY:  And am I correct you don't

4    need to take Mr. Horn's deposition?

5          MR. WILLIAMSON:  I don't think so, no.

6    I take Mr. Beta at his word that he knows more than

7    Mr. Horn.

8          MR. PEABODY:  It's Mr. Betta.  Betta, not

9    Beta.

10         MR. WILLIAMSON:  Betta.  I apologize.

11         MR. PEABODY:  All right.  Well, I guess

12   we're done.

13         MR. WILLIAMSON:  Good.  Thank you.

14         THE WITNESS:  Thank you.

15         MR. PEABODY:  Thank you.

16                   (Deposition adjourned at

17                    2:10 p.m.)

18                   (Signature reserved.)

19              -o0o-

20

21

22

23

24

25

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

Page 50

1                          SIGNATURE

2

3

4           I declare under penalty of perjury under

5      the laws of the State of Washington that I have read

6      my within deposition, and the same is true and

7      accurate, save and except for changes and/or

8      corrections, if any, as indicated by me on the CHANGE

9      SHEET flyleaf page hereof.

10

11

12           Signed in ..............., Washington,

13      on the ......... day of ................., 2010.

14

15

16

17

18                         .............................

19                         CHARLES BETTA

20                         TAKEN:  November 17, 2010

21

22

23

24

25      MARY A. WHITNEY, CCR - WCRL #2728

Charles Betta                                November 17, 2010

Page 51

1                    CERTIFICATE

2

3    STATE OF WASHINGTON    )

4                           )   ss.

5    COUNTY OF KING         )

6         I, the undersigned Washington Certified Court

7    Reporter, hereby certify that the foregoing deposition

8    upon oral examination of CHARLES BETTA was taken

9    stenographically before me on November 17, 2010, and

10   thereafter transcribed under my direction;

11        That the witness, before examination, was

12   first duly sworn by me pursuant to RCW 5.28.010 to

13   testify truthfully; that the transcript of the

14   deposition is a full, true, and correct transcript to

15   the best of my ability; and that I am neither attorney

16   for, nor relative or employee of any of the parties to

17   the action, or any attorney or counsel employed by the

18   parties hereto, nor financially interested in its

19   outcome.

20        IN WITNESS WHEREOF, I have hereunto set my

21   hand this 29th day of November, 2010.

22

23                    /S/ Mary A. Whitney, CCR

24

25   MARY A. WHITNEY, CCR - WCRL #2728

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

                                                          Page 52

 1
 2    DATE:   November 29, 2010
 3
              MAX N. PEABODY, ESQ.
 4            Gibson Peabody
              1601 Fifth Avenue
 5            Suite 2410
              Seattle, WA  98101
 6
 7
         NOTICE OF READINESS FOR SIGNATURE
 8
 9            Case Name:  RINKY DINK, et al. vs. CAS
              Venue:      SUP/WA/KING
10            Cause No.:  10-2-21906-4 SEA
              Witness:    CHARLES BETTA
11            Taken:      NOVEMBER 17, 2010
12
              Enclosed is your copy of the transcript of
13            CHARLES BETTA
14            Please arrange for the witness to review the
              deposition transcript, record any changes on
15            the Change Sheet, and sign, (1), the Change
              Sheet and, (2), the Original Signature Page.
16
              Please return the Change Sheet and the
17            Original Signature Page to this office within
              30 days so they may be filed with the original
18            transcript.
19
                         . . . . . . . . . . . . . .
20                       MARY A. WHITNEY, CCR
21
22
23    cc:  Roblin J. Williamson, Esq.
           File
24         Enclosure - (Envelope)
25

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

Page 53

1

2      DATE FILED:  November 29, 2010

3

4            ROBLIN J. WILLIAMSON, ESQ.
             Williams & Williamson
5            187 Parfitt Way
             Suite 250
6            Bainbridge Island, WA  98110

7

8      NOTICE RE FILING OF ORIGINAL DEPOSITION

9

10           Case Name:  RINKY DINK, et al. vs. CAS
             Venue:       SUP/WA/KING
11           Cause No.:  10-2-21906-4 SEA
             Witness:    CHARLES BETTA
12           Taken:      NOVEMBER 17, 2010

13

14           Enclosed is the original sealed transcript of
             CHARLES BETTA

15
             The original signature page and changes, if
16           any, received by this office will be
             forwarded to all counsel.

17

18

19

                             . . . . . . . . . . . . . .
20                           MARY A. WHITNEY, CCR

21

22

23

       cc:  Max N. Peabody, Esq.
24          File

25

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

```
                                                     Page 54
1              C H A N G E   S H E E T

2

3        PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS
         SHEET, INDICATING PAGE, LINE, AND CORRECTION/REASON
4
     -------------------------------------------------------
5
         PAGE / LINE               CORRECTION/REASON
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20
                          ---------------------------
21                        CHARLES BETTA

22                        TAKEN:  November 17, 2010

23
     Re:  RINKY DINK, et al. vs. CAS
24        SUP/WA/KING - No. 10-2-21906-4 SEA

25   MARY A. WHITNEY, CCR - WCRL #2728
```

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                November 17, 2010

Page 55

1        IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

2              IN AND FOR THE COUNTY OF KING

3    _____

4

5    RINKY DINK, INC., d/b/a PET    )

6    STOP, a Washington corp.,      )

7    on behalf of itself and all    )

8    Others similarly situated,     )   No. 10-2-21906-4 SEA

9          Plaintiffs,              )

10      vs.                         )

11   CAPITAL ADVANCE SOLUTIONS,     )

12   LLC,                           )

13          Defendant.              )

14   _____

15

16      Original Signature Page and Change Sheet to the

17         Deposition Upon Oral Examination of

18                  CHARLES BETTA

19   _____

20

21                 November 17, 2010

22                  187 Parfitt Way

23            Bainbridge Island, Washington

24

25   REPORTED BY:  MARY A. WHITNEY, CCR - WCRL #2728

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                  November 17, 2010

```
                                                    Page 56

 1

 2    Date filed:

 3

 4            ROBLIN J. WILLIAMSON, ESQ.
              Williams & Williamson
 5            187 Parfitt Way
              Suite 250
 6            Bainbridge Island, WA  98110

 7

 8      NOTICE RE CHANGES TO ORIGINAL DEPOSITION

 9

10            Case Name:  RINKY DINK, et al. vs. CAS
              Venue:      SUP/WA/KING
11            Cause No.:  10-2-21906-4 SEA
              Witness:    CHARLES BETTA
12            Taken:      NOVEMBER 17, 2010

13

14

              Enclosed is a copy of the Signature Page and
15            Change Sheet, if any, to the above-referenced
              original deposition transcript.
16

17

18

                            . . . . . . . . . . . . .
19                          MARY A. WHITNEY, CCR

20

21

22

23

      cc:  Max N. Peabody, Esq.
24         File

25
```

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    (206) 622-6661 * (800) 657-1110 FAX: (206) 622-6236

115c6dbf-53ec-42c5-9970-71f42089cb02

Charles Betta                                    November 17, 2010

Page 57

1

2     APPEARANCES:   (FOR FILING PURPOSES)

3

4

5                      ROBLIN J. WILLIAMSON, ESQ.
                       Williams & Williamson
6                      187 Parfitt Way
                       Suite 250
7                      Bainbridge Island, WA  98110
                       (206) 780-4447
8                      roblin@williamslaw.com

9

10

11                          -o0o-

12

13

14

15

16

17

18

19

20

21

22

23

24

25

115c6dbf-53ec-42c5-9970-71f42089cb02